## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**ROBERTA DAVIS,**

                        **Plaintiff,**

**-vs-**                                                    **Case No.  2:10-cv-673-FtM-DNF**

**COMMISSIONER OF SOCIAL
SECURITY,**

                        **Defendant.**

_____

## OPINION AND ORDER

Claimant, Roberta Davis, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for disability, disability insurance benefits and Supplemental Security Income (SSI). The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number) and the parties filed legal memoranda in support of their positions. For the reasons set out herein, the decision of the Commissioner is AFFIRMED, pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

### I.      Social Security Act Eligibility, Procedural History and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R.§ 404.1505. The impairment must be severe, making Claimant

unable to perform his previous work, or any alternative substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A. Procedural History

On September 4, 2003, the Claimant filed applications for disability, disability insurance benefits and Supplemental Security Income payments with an alleged disability onset date of May 1, 2003. (Tr. 23). Claimant's request for benefits was denied initially on February 24, 2004 and upon reconsideration on June 11, 2004. (Tr. 23, 38, 43). A hearing was held by the Administrative Law Judge (hereinafter referred to as "ALJ") on December 13, 2005 after a finding of good cause for the late filing of the request. (Tr. 23). Claimant waived her right to representation, appeared and testified. (Tr. 23). Joyce Courtright, a vocational expert, also presented testimony. (Tr. 23). On March 24, 2006, the ALJ determined that the Claimant was not disabled within the meaning of the Social Security Act. (Tr. 29). On July 25, 2007, the Appeals Council vacated the ALJ's decision because new and material evidence was presented. (Tr. 249-51). On October 30, 2007, Claimant's representative notified the Appeals Council that the new evidence that served as grounds for remand did not belong to Claimant, but to someone else with the same name. (Tr. 12). Upon realization of the error, the Appeals Council vacated its remand order and granted Claimant 20 days to present new evidence and/or arguments. (Tr. 10-14). Claimant's representative submitted a new request for review, legal memorandum, and new evidence but the Appeals Council denied the request for review on September 23, 2010. (Tr. 5-9).

### B. Standard of Review

District Courts review *de novo* the ALJ's decision in a limited inquiry as to whether the decision as a whole is supported by substantial evidence. *Conner v. Astrue*, 415 F. App'x 992, 995

(11th Cir. 2011); 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla but less than a preponderance." *Id.* Substantial evidence consists of relevant information that would lead a reasonable person to conclude that there was adequate support for the ALJ's decision. *Id.* When conducting the review, the court is not permitted to reweigh the evidence or substitute its judgment for the ALJ's judgment. *Hernandez v. Comm'r of Soc. Sec.*, 2011 U.S. App. LEXIS 14174 at *2 (11th Cir. 2011). However, the court may reverse when " the ALJ fails to apply the correct law or to provide [us] with sufficient reasoning for determining that the proper legal analysis has been conducted." *Id.*

### C. Five-Step Process in Evaluating a Claim of Disability

The ALJ must follow a five-step process in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant works and performs substantial gainful activity, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), (b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit a claimant's physical or mental ability to perform basic work activities, then the claimant does not suffer from a severe impairment and is therefore not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Third, if a claimant's impairments do not meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d). Fourth, if a claimant can perform past relevant work despite the impairments of her residual functional capacity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), (e). Fifth, a court must consider the residual functional capacity as well as the age, education, and work experience of Claimant to determine if she can make an adjustment to other work. If Claimant is able to adjust to other work, Claimant will not be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), (f)–(g).

## II.      Review of Facts

### A. Background Facts

The Claimant was between the ages of 45 and 49 at all pertinent times to this decision, which is considered to be a younger individual. (Tr. 27). She has a high-school education and no transferable skills from any past relevant work. (Tr. 27). Claimant previously worked at Juicy Lucy's primarily using a deep fryer in 2004 and as a Pizza Hut delivery driver in 2005. (Tr. 24).  Claimant alleges her neck and back problems coupled with her manipulative difficulty prevent her from working. (Tr. 24). She also complains of irritable bowel syndrome, asthma, anxiety, depression, bipolar disorder, and personality disorder. (Tr. 24).

### B. The ALJ's Findings

At the first step, the ALJ concluded that Claimant's work history suggests she is capable of engaging in substantial gainful activity**.**  (Tr. 24). The ALJ explained that even though the earnings of Claimant's job at Juicy Lucy's and Pizza Hut do not satisfy the monthly threshold amounts of substantial gainful activity, they are nonetheless substantial and suggest the capacity for the Claimant to engage in substantial gainful activity. (Tr. 24).

At the second step, the ALJ concluded that the Claimant has "severe" impairments including: (1) degenerative disc disease in the cervical spine; (2) status-post fusion at C5-6; (3) spinal curvature; (4) disc bulging at L4-5; (5) subacromial fluid and osteoarthritis in the right shoulder; (6) chronic obstructive pulmonary disease; (7) irritable bowel syndrome; and (8) gastroesophagel reflux disorder. (Tr. 25). The ALJ also concluded that Claimant suffers from anxiety, depression, and bipolar disorder but these conditions do not limit Claimant's performance of daily activities. (Tr. 25).

-4-

The ALJ concluded at the third step that the Claimant's impairments do not meet or medically equal the severity criteria of any of the listings in Appendix 1, Subpart P, Regulation No. 4. (Tr. 25).

At the fourth step, the ALJ concluded that the Claimant has retained residual functional capacity for a wide range of sedentary work. (Tr. 27). The ALJ determined Claimant's limitations were reasonable. (Tr. 27). The ALJ further explained:

> [C]laimant can lift, carry, push and pull up to 10 pounds occasionally and five pounds frequently; she can stand and/or walk for up to two hours and sit for up to six hours in a typical eight-hour workday. She cannot reach overhead with the right upper extremity. She can occasionally climb ramps (but never ropes, ladders or scaffolds), balance and stoop; however, she cannot kneel, crouch or crawl at any time. She must not be exposed to dangerous moving machinery or unprotected heights, to extreme temperatures or humidity, or to pollutants (gasses, dust, fumes). She may have only an occasional interaction with the public.

(Tr. 27). Furthermore, the ALJ determined that Claimant's continuous work just below substantial gainful activity further fails to support her allegation of disability. (Tr. 26).

Lastly, after considering the Claimant's age, education, work experience, and residual functional capacity, the ALJ determined that there are a significant number of available local and national jobs the Claimant can perform. (Tr. 27). The vocational expert testified that available jobs included: lens inserter, lens-block gauger, and stone setting. (Tr. 27). Based on these findings, the ALJ concluded that Claimant was not considered disabled. (Tr. 27).

### C. Medical Evidence

At the age of 2, Claimant was diagnosed with asthma. (Tr. 171). Claimant injured her neck in an auto accident at age 11. (Tr. 171). Between the ages of 16 and 17, Claimant suffered from chronic headaches and problems with her cervical vertebrae. The Claimant had tubal ligation in 1990, her gallbladder removed in 1991, and her uterus removed with fibroid tumors in 1993. (Tr. 171).

-5-

Claimant also had a cervical fusion and a breast biopsy which proved negative for cancer. (Tr. 171). In 2001, Claimant injured her right knee, right arm, and lower back in another auto accident. (Tr. 171).

On May 21, 1996, Laura Seed, M.D. of the Ruth Cooper Center evaluated Claimant and diagnosed her with bipolar disorder and obsessive compulsive disorder. (Tr. 127). Dr. Seed reevaluated Claimant on July 10, 1996 and determined that Claimant suffered from a personality disorder, rather than bipolar disorder, obsessive compulsive disorder, depression, and asthma. (Tr. 127-28).

On December 1, 1999, Norma Henriquez, M.D. diagnosed Claimant with depressive disorder, generalized anxiety disorder, personality disorder and asthma. (Tr. 112). Dr. Henriquez noted that continued treatment was needed to monitor the side effects of medication. (Tr. 112). Dr. Henriquez also noted that the patient had previously demonstrated significant cognitive, emotional, and behavioral deterioration. (Tr. 112).

On February 23, 2000, Claimant had an MRI that revealed no interval change but bilateral posterolateral C5-6 broad protrusions extending into the region of the C6 nerve roots bilaterally with marked right and moderate left neural foraminal narrowing. (Tr. 153). Stuart Bobman, M.D. of the Radiology Regional Center in Ft. Myers suggested clinical correlation for bilateral C6 radiculopathy. (Tr. 153).

On March 29, 2000, Claimant was examined by Gary Correnti, M.D. of Southwest Florida Regional Medical Center for bilateral arm pain. (Tr. 131, 133). Dr. Correnti performed anterior cervical discectomy and fusion at C5-6. (Tr. 141). An MRI revealed a large central herniated disk with bilateral neural foraminal stenosis. (Tr. 131).

Claimant returned to Dr. Correnti on April 7, 2000 for a post surgery checkup where Claimant complained of hoarseness, difficulty swallowing, a lump located by the incision site, numbness and tingling. (Tr. 141)**.** Dr. Correnti noted a 60% improvement in Claimant's thumb pain, no fever or chills, and Claimant's strength was considered normal. (Tr. 141). Dr. Correnti concluded that the hoarseness and swallowing difficulties are due to the tissue swelling that resulted from surgery. (Tr. 141). Furthermore, there were no hematoma or abscess and Claimant's vocal cords were in good working order. (Tr. 141). Dr. Correnti noted that  Claimant continued  to smoke two packs of cigarettes a day,  her spinal alignment was satisfactory  with no fracture or bone destruction and her prevertebral soft tissues were intact. (Tr. 141-142).

On August 15, 2000, Claimant discussed the results of a subsequent MRI with Dr. Correnti. (Tr. 151). Dr. Correnti explained that the MRI taken the previous day revealed vertebral body heights to be well maintained and the spinal cord itself appeared normal. (Tr. 151). Dr. Correnti also found evidence that  the anterior cervical fusion C5-6 with graft was in good position and noted postoperative changes in disc space. (Tr. 151). The MRI did not reveal any evidence of C3-4, C4-5, C5-6, or C6-7 disc herniation, spinal stenosis or foraminal stenosis. (Tr. 151).

On January 1, 2003, Claimant went to Family Health Centers for stomach problems and a persistent head cold. (Tr. 170). On July 30, 2003, Claimant sought treatment again at the Family Health Centers for a swollen  abdomen and persistent diarrhea. (Tr. 169). Claimant was diagnosed with fatigue, diarrhea, allergies and menopause. (Tr. 169).

On September 11, 2003, Claimant sought treatment for shoulder pain, muscle spasm, right thumb numbness, shooting  pains and swelling at the Family Health Centers. (Tr. 166). The physician prescribed medicine, ordered x-rays and referred her to orthopedics for right shoulder pain. (Tr. 166).

Approximately two weeks later on September 29, 2003, Claimant returned to Family Health Centers complaining of body aches. (Tr. 164). Claimant was then prescribed pain killers and muscle relaxers. (Tr. 165).

On October 9, 2003, Claimant went to Radiology Regional Center concerning her back and shoulder pain. (Tr. 230). Dr. Kirk Banerian discovered that Claimant had degenerative changes and scoliosis which caused Claimant's pain. (Tr. 147, 230). Specifically, Dr. Banerian made the following observations: mild levoscoliosis of the thoracolumbar spine, surgical clips in the right upper quadrant incident to prior cholecystectomy, mild disc space narrowing at L4-5 and L5-S1, moderate hypertrophic degenerative change involving L4-S1 facet joint on the right and mild degenerative change involving right L4-5 and left L5-S1 facet joints. (Tr. 147). However, there were no significant abnormalities present. (Tr. 147, 230-31).

On November 3, 2003, James J. O'Mailia, M.D. noted that Claimant suffers from significantly problematic gastrointestinal symptoms including: marked diarrhea, with mucus per rectum, abdominal distention and bloating. (Tr. 154). These conditions have been associated with anorexia and dysphagia. (Tr. 154). These conditions also worsen with heightened stress (Tr. 155). Dr. O'Mailia noted that Claimant has a history of irritable bowel syndrome but had not previously had an endoscopic study. (Tr. 154). Dr. O'Mailia ordered an upper and lower endoscopy to evaluate her structural anatomy and postendoscopy but the record does not indicate whether this procedure was performed. (Tr. 154).

On January 7, 2004, Claimant was evaluated by Joseph J. White, Ph.D. (Tr. 171). Dr. White noted that Claimant was previously treated for bipolar disorder, depression, and obsessive compulsive disorder. (Tr. 172). During the interview, Dr. White noticed that Claimant was anxious

and "fidgety" but this was the only abnormality that was demonstrated during the examination. (Tr. 172). Claimant dressed appropriately, demonstrated good personal hygiene, spoke normally, expressed coherent thinking , was fully oriented, displayed good attention and concentration, and appeared to have an adequate memory. (Tr. 172). Dr. White concluded that Claimant suffered from bipolar disorder and depression. (Tr. 172). Dr. White was of the opinion that Claimant's mental impairments do not constitute a barrier to overall functioning. (Tr. 26).

On January 29, 2004, Rajan Sareen, M.D. of Family Medical Clinic examined Claimant for strong, solid pain in her lower back, neck and shoulder pain. (Tr. 174-175). Claimant also complained of tingling in her legs and that she was unable to feel her right thumb. (Tr. 174). Dr. Sareen observed that the ROM is reduced in several joints but the patient did not exert maximally. (Tr. 175). Dr. Sareen also noted that dyspnea is secondary to COPD which is secondary to smoking. (Tr. 175).

At Claimant's appointment with Dr. Correnti on May 17, 2004, Claimant was diagnosed with cervical displacement. (Tr. 129). Claimant then began seeing chiropractor Dr. Anthony D'Agostino on August 23, 2004 where she presented x-rays that proved minimal disc narrowing and degenerative changes in the lumbar spine. (Tr. 227). Dr. D'Agostino diagnosed Claimant with cervicalgia, thoracic pain, lumbar pain, and cervicobrachial syndrome. (Tr. 271). Treatment for these conditions consisted of cervical, thoracic, and lumbar spinal manipulation, extremity manipulation of the occiput and myofascial release to trigger points in the thoracic and occipital regions. (Tr. 271). Claimant attended treatment every two to three weeks until October 31, 2007. (Tr. 272-312).

Claimant returned to Dr. Banerian on September 7, 2004 where he discovered a large amount of fluid located in the subacromial and subdeltoid bursae. (Tr. 228). Dr. Banerian concluded that

Claimant had a marked subacrominal fluid distension associated with problematic tearing at the posterolateral insertion of supraspinatus tendon. (Tr. 228). The MRI of the lumbar spine revealed L4-5 disc bulge and protrusion with neural foraminal compromise, worse on the left. (Tr. 229).

On December 9, 2005, Dr. D'Agostino determined that despite receipt of regular care, Claimant only responded to treatment temporarily and all treatments eventually regressed. (Tr. 227). He noted that Claimant experienced the return of lumbar pain shortly after being at work. (Tr. 227). Dr. D'Agostino recommended Claimant to sit down periodically throughout the work day and "[a]s long as she remains employed in a job that requires her to stand or sit for long periods of time, she will continue to experience these symptoms." (Tr. 227).

In 2006, Claimant complained of suffering from more pain. On January 26, she was admitted to the hospital for rib pain. (Tr. 336). On March 30, Claimant sprained her left foot and ankle. (Tr. 330). On October 4, Claimant complained of pain in her right shoulder but the doctor did not locate a fracture or dislocation so he recommended physical therapy twice a week for a month but the Claimant did not comply with the doctor's orders. (Tr. 322-23, 326-28). Claimant was later admitted to the emergency room for a five-day cough where it was determined that Claimant had bronchitis and COPD. (Tr. 315-16).

In August of 2007, Claimant's hands began to constantly shake and she began having panic attacks. (Tr. 361). On August 30, she started therapy with Norman Krudelbach, Ph.D. to help decrease her anxiety. (Tr. 354). During her therapy sessions, Claimant discussed her son's death in 2006 and everything that was wrong in her life. (Tr. 350, 352, 357). Dr. Krudelbach noted that Claimant's anger is easily triggered and she becomes verbally aggressive. (Tr. 357). Claimant is easily distracted and unable to focus. (Tr. 353, 357). Claimant's arthritis and osteoporosis contribute to her pain and

health problems. (Tr. 353, 357). Dr. Kruedelbach observed that Claimant has difficulty dealing with these problems all at once. (Tr. 353). Dr. Kruedelbach tried to teach Claimant how to practice coping skills for any obstacles in her life. (Tr. 350-53).

### D. State Agency Evaluations by Examining Medical Sources

On June 10, 2004, Claimant met with Ronald Kline, M.D. at the state's request. (Tr. 214). Dr. Kline primarily diagnosed Claimant with chronic neck and back pain with a secondary diagnosis of spine cervical fusion. (Tr. 214). Dr. Kline determined that Claimant could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (Tr. 215). Dr. Kline also determined that Claimant could sit, stand and/or walk for about 6 hours in an 8-hour work day if given normal breaks. (Tr. 215). Claimant's ability to push and/or pull was not determined to be limited but she occasionally had postural limitations of climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 215-16). Claimant did not present any manipulative, visual, communicative, or environmental limitations. (Tr. 217-18).

### E. State Agency Evaluations by Non-Examining Medical Sources

On January 22, 2004, Claimant met with Martha Putney, Ph.D. at the request of the state. (Tr. 186). Dr. Putney diagnosed Claimant with bipolar disorder but determined that Claimant's medical impairments were not severe. (Tr. 186, 189). Dr. Putney observed that Claimant had no degree of limitations regarding daily living, maintaining social functioning or episodes of decompensation for an extended period. (Tr. 196). However, Dr. Putney did notice a mild degree of limitation in Claimant's ability to maintain concentration, persistence or pace. (Tr. 196).

On May 28, 2004, Claimant met with Timothy Foster, Ph.D. at the state's request. (Tr. 200). Dr. Foster diagnosed Claimant with depression but determined that her medical impairments were not

severe. (Tr. 200, 203). Dr. Foster noted that Claimant suffered from a coexisting nonmental impairment that required referral to another medical specialty. (Tr. 200). Dr. Foster observed that Claimant did not suffer any degree of limitation regarding activities of daily living, maintaining concentration, persistence or pace, and episodes of decompensation for an extended duration. (Tr. 210). However, Dr. Foster determined Claimant had a mild degree of limitation in maintaining social functioning. (Tr. 210).

### F. Testimony

During the first hearing on December 13, 2005, the Claimant testified as follows. Over the past 15 years, Claimant has worked a variety of different jobs. (Tr. 402). Claimant testified that some of her past employment required heavy lifting. (Tr. 399, 404). For example, Claimant worked for Beachcombs where she was required to lift over 80 pound boxes. (Tr. 403-04). Similarly, as a full time electronic technician, she was required to lift up to 100 pounds five to ten times a day. (Tr 398-99).

Claimant also testified that some of her previous employment did not involve any heavy lifting. For example, Claimant worked as a telemarketer for Sears, which only required long periods of sitting at a desk. (Tr. 399-401).

Claimant testified that through her various past employment, she has worked a variety of different machinery. At Dean Steel, Claimant was employed as a machine operator that involved operating a ceiling crane. (Tr. 402-03). Claimant also worked at Juicy Lucy's where she regularly operated a deep fryer. (Tr. 406-07). Claimant explained to the ALJ that she is currently employed as a Pizza Hut delivery driver but barely makes enough money to pay her rent or be able to refuse Medicaid assistance. (Tr. 406-07).

Claimant testified that she has been unable to work since May 2003. (Tr. 407). Claimant stated that she began to suffer from excruciating back pain in May 2003 which occasionally prevented her from getting out of bed. (Tr. 407-08). Part of her back pain was determined to be caused by osteoporosis. (Tr. 410). Driving has become a problem for Claimant because the constant pushing on the pedals and the uncomfortable seat worsen her back pain and create pain in her right hip. (Tr. 409). Claimant has been prescribed pain killers and muscle relaxers for her back. (Tr. 409).

Because of Claimant's back pain, Claimant testified that she cannot walk for more than two blocks. (Tr. 412). Claimant can only stand for two to three hours without needing a ten minute break to sit down. (Tr. 413). Claimant explained that she is only able to sit for a two hour period if the chair is well cushioned. (Tr. 413). Even then, Claimant stated that she is stiff when she gets up and can hardly move after sitting for so long. (Tr. 413).

Claimant testified that she suffers from anxiety but her doctor refused to prescribe medication. (Tr. 408). Failure to treat her anxiety has caused her more medical problems. For example, her lack of control over her nerves has created stomach problems which require medication. (Tr. 410). Without her medication, Claimant would have diarrhea all day. (Tr. 410). However, sometimes the medication has the opposite effect of what is intended. (Tr. 410). Claimant also suffers from difficulty concentrating which is related to her anxiety problem. (Tr. 410). Claimant has been prescribed medication to aide her ability to concentrate. (Tr. 410).

Claimant testified that a psychiatrist told her that if she does not cut out all the stress in her life, she would suffer from a stroke, heart attack, or ulcers. (Tr. 416). According to Claimant, another doctor told her that her stomach problems are stress-related. (Tr. 416-17). Claimant also explained that her anxiety has physical manifestations such as her shakes, difficulty concentrating, and muscle tension

-13-

in unfamiliar situations. (Tr. 417). Because of her stomach problems caused by untreated anxiety, Claimant testifies that she has an erosion on her vocal cords. (Tr. 417).

Claimant stated that she often has "Charley horses" in the middle of the night and has been prescribed medication. (Tr. 411). However, this medication interferes with her pain pills and muscle relaxers. (Tr. 411). For example, taking one pill for her "Charley horses" along with the pain pills and muscle relaxers helps her sleep but not well. (Tr. 411).

When Claimant was not working, Claimant testified that her daily activities included taking her pain pills, sitting in a real cushiony recliner for an hour or so and making something to eat. (Tr. 413-14). Claimant stated that she cannot sit in her kitchen chairs because they are too hard. (Tr. 414). Claimant testified that standing in the cold bathtub during a shower too long really bothers her. (Tr. 415). Humidity and heat effect her breathing. (Tr. 415). Claimant also testified that she waits for her son to get home to help her with household chores such as laundry. (Tr. 414).

Claimant testified that she is only capable of lifting ten pounds. (Tr. 413). Claimant also testified that her right shoulder prohibits her from raising her arm above the elbow height. (Tr. 415-16).

The ALJ posed a hypothetical question to Vocational Expert ("VE"), Joyce Courtright. (Tr. 423). In the hypothetical, the individual is assumed to be between the ages of 46 and 49 with a high school education and the same past relevant work experience as the Claimant. (Tr. 423-24). The ALJ then presented the VE the following hypothetical:

> [T]he first hypothetical I'll pose to you is based on Exhibit 10, 11, 12, and 13F and that's the assessment of the Social Security doctors and psychologists. And that would be for light work, lift, carry, push and pull 20 pounds on occasion, 10 pounds frequently. Sit, stand or walk six to eight hours in an eight hour day. Frequent lifting

> overhead and occasional climb, balance, stoop, crouch, kneel and crawl. Now we're
> right to agree with their assessment, could any of these past jobs be performed?

(Tr. 424). The VE testified that the hypothetical individual could perform employment as a

telemarketer, cashier/checker, and delivery driver. (Tr. 424).

The ALJ then proposed to the VE:

> [A]ssume that lifting, carrying, pushing and pulling would be limited to ten pounds on
> occasion, five pounds frequently. An individual could sit for six hours, stand and walk
> for two in an eight hour day. No overhead reaching with the right upper extremity. The
> individual could never engage in work like, climbing ladders or ropes or scaffolding.
> Could occasionally climb short flights or stairs and ramps. Occasionally balance and
> stoop. Never crouch, kneel or crawl. Due to medications, no operation of dangerous
> moving machinery or work at unprotected heights. No concentrated exposure to
> humidity, heat, cold, dust, fumes or gases. Only occasional interaction with the public.
> Now with those limitations, would that preclude the work as a telemarketer?

(Tr. 424).  The VE responded that such an individual would not be able to be employed as a

telemarketer[1]. (Tr. 424).  The VE explained that manual work and production inspection were within

the range of possible employment opportunities. (Tr. 425). The VE identified jobs within that residual

functional capacity that an individual could do such as: lens inserting, lens block gauging, and stone

setting. (Tr. 425). The VE testified that these jobs were plentiful in the local and national economy.

(Tr. 425).

The ALJ's final proposal to the VE was as follows:

> I want you to assume in addition to these limitations that the individual secondary to
> problems with concentration and with effects of anxiety would not be able to sustain
> work activities for a 40 hour week, eight hour day basis. Would that degree of
> limitation in concentration and effective anxiety preclude competitive employment?

---

[1] Claimant's past relevant work included employment as a telemarketer. (Tr. 399-401).

(Tr. 425). The VE responded that such an individual would be precluded from unskilled, sedentary level employment.[2] (Tr. 425). The Claimant then testified that her arthritis in her back is moving into her hands. (Tr. 425). Claimant testified she could barely move her left thumb and activities that require her to use her hands are difficult. (Tr. 425). Claimant explained that because of the difficulties with her hands, she quit her previous employment in electronics. (Tr.425-26). Claimant then asked the VE if these employment opportunities required much work with her hands. (Tr. 426). The VE explained that each of these jobs require frequent manual dexterity. (Tr. 426).

### III.   Specific Issues and Conclusions of Law

Plaintiff raises the following issues on appeal: (1) the Appeals Council's perfunctorily adhered to the ALJ's decision without considering new and material evidence presented; (2) the ALJ's decision was not supported by substantial evidence as she failed to consider the alleged problem with Claimant's hands; and (3) the ALJ's decision was not supported by substantial evidence because she failed to consider Dr. D'Agostino's opinion and failed to state the weight she assigned to Dr. D'Agostino's opinion.

### A.  Whether the Appeals Council Perfunctorily Adhered to the ALJ's Decision Without Considering New and Material Evidence Presented

#### 1. Perfunctorily Adherence

---

[2]Although the ALJ presented these hypotheticals of Claimant's allegations, in her decision, she determined that Claimant was not credible as to her complaints nor did the medical evidence support her complaints. Furthermore, Claimant's ability to continually work at just below the substantial gainful activity level fails to support her allegation of disability. The ALJ determined Claimant could lift, carry, push and pull up to 10 pounds occasionally and 5 pounds frequently; she can stand and/or walk up for up to two hours and sit for up to six hours in an eight hour workday. She cannot reach overhead with the upper right extremity. She can occasionally climb ramps (but never ropes, ladders or scaffolds), balance and stoop; however, she cannot kneel crouch or crawl. She must not be exposed to dangerous moving machinery or unprotected heights, to extreme temperatures or humidity, or to pollutants. She may only have an occasional interaction with the public. The ALJ determined given these limitations, Claimant is capable of employment in a wide range of sedentary work. (Tr. 26-27).

The Claimant argues that the Appeals Council had perfunctorily adhered to the ALJ decision as evident from  simply  providing a  boilerplate letter to her with boilerplate language that "[w]e found no reason under our rules to review the [ALJ]'s decision." (Doc. 25 p. 17). Conversely, the

Commissioner argues that there is no articulation duty on the Appeals Council when it denies a request for review. (Doc. 26 p. 6).

When  the Appeals  Council refuses to consider new evidence submitted and denies review, the decision is subject to judicial review. *Haws v. Apfel*, 61 F. Supp. 2d 1266, 1284 (M.D. Fla. June 28, 1999). The court must review whether the decision to deny benefits is supported by substantial evidence in the record as a whole, including  evidence submitted  to the Appeals Council, if the plaintiff challenges the Appeals Council's decision to deny review despite receipt of the post-ALJ information. *Solomon v. Comm'r of Soc. Sec.*, 2011 U.S. App. LEXIS 12493 at *4 (11th Cir. June 17, 2011)(citing *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1266 (11th Cir. 2007)). The court may remand a case where the "Appeals Council failed to adequately evaluate new evidence submitted to it and instead perfunctorily adhered to the decision of the ALJ." *Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986). However, the Appeals Council is not required to provide a thorough explanation when denying review because the court will consider the  claimant's  evidence anew. *Burgin v. Comm'r of Soc. Sec.*, 420 Fed. App'x. 901, 903 (11th Cir. 2011).

The Appeals Council stated that it reviewed the Claimant's allegations  and  additional evidence but concluded that the information provided does not provide a basis to alter the ALJ's decision. (Tr. 6). This satisfies the requirement that the Appeals Council consider new  evidence. Under Eleventh Circuit precedent, the Appeals Council is not required to explain further its reasons for denial. Accordingly, the Appeals Council did not perfunctorily adhere to the ALJ's decision

because they considered the new evidence but concluded it was insufficient to change the ALJ's decision.

### 2. New and Material Evidence

The Claimant argues that Dr. Krudelbach's opinion, a licensed psychologist, was "new" as he started treating Claimant after the ALJ's decision. (Doc. 25 p. 17). The Claimant also argues that this evidence is "material" because it indicates that Claimant has marked limitations in her social functioning and indicates moderate limitations in other areas of Claimant's basic work activities. (Doc. 25 p. 17-18). Therefore, Dr. Krudelbach's opinion was entitled to significant weight as he regularly treated Claimant for her impairments as the court should consider him a treating source . (Doc. 25 p. 18). Moreover, Dr. Krudelbach's opinion related to the period on or before the date of the ALJ's decision because Dr. Krudelbach stated  that Claimant's disabling conditions existed as of May 1, 2003, Claimant's alleged disability onset date. (Doc. 25 p. 18).

Under 20 C.F.R. §§ 416.93 and 404.1513, a licensed or certified psychologist is considered an acceptable medical source. As such, a licensed or certified psychologist can provide evidence that establishes an  impairment. *Id.* Within the classification of acceptable medical sources are the following different types of sources which are entitled to different weights of opinion: (1) treating source; (2) nontreating source; and (3) nonexamining sources. 20 C.F.R. § 404.1520.  A  treating source is defined as the claimant's own physician, psychologist or other acceptable medical source who provides or has provided the claimant with medical treatment or has had a continuous treatment relationship with the claimant. *Id.* The court will consider a physician or psychologist as a treating source if the claimant regularly receives or previously received treatment required for his/her medical

condition. *Id.* A court will not consider a medical source as a treating source if the claimant sought an evaluation solely to obtain a report in support of claimant's disability claim. *Id.*

Treating physicians' opinions are entitled to  more  weight because such sources are more likely to be able to provide a detailed perspective about the client's medical impairment. 20 C.F.R.§ 404.1527(d)(2). A treating physician's opinion will be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques not inconsistent with other substantial evidence in the record. *Id.* When a court gives a treating source's opinion controlling weight, they consider the following factors: (1) length and frequency of treatment; (2) nature and extent of treatment; (3) supportability; (4) consistency; (5) specialization; and (6) any other evidence that either supports or contradicts the treating physician's opinion. *Id.*

Nontreating sources are entitled to more weight than  nonexamining sources because such sources have examined the claimant. 20 C.F.R. § 404.1527. Nontreating sources are acceptable medical  sources  who  have  examined  but  did  not  treat  or  did  not  have  an  ongoing  treatment relationship with the claimant. 20 C.F.R § 404.1520. This category includes  consultive examiners for the Commissioner. *Id.*

Lastly, nonexamining sources are considered opinion evidence and are given the least weight of the three types of acceptable medical sources. 20 C.F.R. § 404.1527.  Nonexamining sources are acceptable medical sources who have not examined the claimant but provide an opinion in the case. *Id.* This category includes State agency medical and psychological consultants. *Id.*

The  Commissioner  argues  that  this  evidence  is  not  new  or  material.  Specifically,  the Commissioner argues that  Dr. Krudelbach's opinion  and treatment notes do not include any indication that these conditions existed in such a limited condition prior to treatment in 2007. (Doc.

26 p. 7-8). Therefore, the Commissioner argues that Dr. Krudelbach's opinion was not chronologically relevant. (Doc. 26 p. 8). Furthermore, the Commissioner argues that Dr. Krudelbach's opinion was not material because it was not likely to change the ALJ's determination because substantial evidence supported the ALJ's RFC determination and the determination that Claimant could perform work existing in significant numbers in the national economy. (Doc. 26 p. 8). Consequently, Claimant was not considered disabled. (Doc. 26 p. 8). Moreover, Dr. Krudelbach's opinion was inconsistent with Dr. White's opinion and not supported by Claimant's activities of daily living which show that she has had steady employment for approximately eighteen months prior to the ALJ's decision. (Doc. 26 p. 10-11).

Evidence submitted to the Appeals Council is considered with all other evidence presented in determining whether the ALJ's decision was supported by substantial evidence. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1266 (11th Cir. 2007). New evidence submitted to the Appeals Council must be chronologically relevant to the ALJ's decision. *Id.* at 1261. According to 20 C.F.R. § 404.970(b), chronologically relevant evidence is any such evidence that is related to the period on or before the date of the ALJ's decision. New evidence must also be material which means that it would reasonably have expected to change the ALJ's decision. *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998).

The Court concludes that the evidence does not support the notion that Dr. Krudelbach's opinion is new and material which would require reconsideration. First, there is no indication in Dr. Krudelbach's records that there is any medical evidence which supports an onset date of May 2003. The only evidence of the onset date is where Dr. Krudelbach checked the "yes" box when asked if the patient had been disabled from substantial gainful work since May 1, 2003. Furthermore, Dr.

Krudelbach wrote next to the box that "to my knowledge" she had been disabled from substantial gainful employment since the alleged onset date of May 2003. Therefore, it appears the handwritten phrase suggests Dr. Krudelbach only  knew  of the alleged onset date by the Claimant's statements, not any medical evidence.

Second, the presentation of Dr. Krudelbach's opinion would not likely change the ALJ's decision and therefore cannot be considered material evidence. The ALJ concluded that substantial evidence supports the conclusion that Claimant suffers from bipolar disorder, obsessive compulsive disorder, depressive disorder, and personality disorder. However, the ALJ explained  that  these mental impairments do not limit the Claimant's daily living. As such, the ALJ further explained that these impairments do not suggest the Claimant is unable to perform substantial gainful employment.

The ALJ based his conclusions from the opinions of Dr. White, Dr. Putney and Dr. Foster. All of these psychologists concluded that Claimant's mental impairments were not severe enough to interfere with her daily living. These psychologists examined Claimant in 2004 which is closer to the alleged onset date of 2003. This suggests that  their determinations about Claimant's disability are more credible. As such, it is unlikely Dr. Krudelbach's opinion  would  have  altered the ALJ's decision because even though a treating physician, Dr. Krudelbach did not examine Claimant until after four years of her alleged onset date which would be too attenuated to constitute controlling weight.

**B. Whether the ALJ's Decision Was Supported By Substantial Evidence for Failure to Consider the Alleged Problem with Claimant's Hands**

The Claimant argues that the ALJ's failure to consider problems with Claimant's hands was not a harmless error and led to a decision unsupported by substantial evidence. (Doc. 26 p. 21).

Claimant explains that the problems with her hands alone would preclude performing the three jobs suggested by the VE and even the most unskilled sedentary jobs. (Doc. 26 p. 21). The Commissioner argues that the ALJ properly considered Claimant's complaints of limitations in her hands, but did not find those limitations credible, and therefore properly did not include those limitations in the hypothetical question to the VE. (Doc. 26 p. 15).

In evaluating the disability claim, the ALJ must consider every alleged impairment. *Hurley v. Comm'r of Soc. Sec.*, 147 Fed. App'x. 103, 106 (11th Cir. 2005). The ALJ must specifically state the weight given and the reasons for the weight to each item of evidence. *Luckey v. Astrue*, 331 Fed. App'x. 634, 639 (11th Cir. 2009). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). Although the ALJ is not required to specifically refer to every piece of evidence, the ALJ's decision as a whole must be supported by substantial evidence in the record. *Hart v. Astrue*, 2011 U.S. Dist. LEXIS 108426 at *15-16 (M.D. Fla. Sept. 19, 2011). A decision cannot be based upon substantial evidence if it focuses on one piece of evidence while disregarding other opposing evidence. *Id.* Failure to specify the weight or reason for not giving any weight has been determined to be reversible error. *Id.*

Although the ALJ did not explicitly mention Claimant's hands, the ALJ addressed the problem of Claimant's cervical degenerative disc disease which is the source of Claimant's hand problems. The ALJ determined that the evidence presented did not support Claimant's allegations. After Claimant underwent anterior cervical microdiscectomy and fusion in 2000, Claimant reported a 60% improvement in her hands. There are no other recorded problems with her hands until 2004 when

Claimant complained that she was unable to feel her right thumb. However, there is no evidence presented that proves Claimant sought treatment for this condition. Moreover, Dr. Kline examined Claimant in 2004 and concluded Claimant did not demonstrate any manipulative limitations.

Claimant testified during the hearing that anxiety caused her hands to shake and that arthritis is moving into her hands but she did not present any medical evidence that would prove these allegations. The ALJ noted that Claimant's condition did not require any hospitalization, emergency care, orthopedic treatment, or pain management despite the availability of low to free cost of care. Therefore, the ALJ did properly consider Claimant's alleged hand impairments but did not consider them to be supported by the evidence.

### C. Whether the ALJ's Decision Was Supported By Substantial Evidence For Failure to Consider Dr. D'Agostino's Opinion and Failure to State the Weight She Assigned to Dr. D'Agostino's Opinion

The Claimant argues that the ALJ erred in failing to fully discuss Dr. D'Agostino's opinion and failing to state the weight that she has given it. (Doc. 25 p. 24). The Commissioner argues that even if this Court disagrees with the ALJ's resolution of the factual issues, and would resolve those disputed factual issues differently, the ALJ's decision must be affirmed where it is supported by substantial evidence in the record as a whole. (Doc. 26 p. 17). The ALJ stated in her opinion that she considered all objective medical and other evidence but concluded Dr. D'Agostino exaggerated the Claimant's limitations. (Tr. 25-26).

Chiropractors are not considered an acceptable medical source but are considered "other sources" that can demonstrate the severity of an impairment and how it effects a person's ability to work. 20 C.F.R. § 404.1513(d)(1). Unlike acceptable medical sources, other sources cannot establish

the existence of an impairment. 20 C.F.R. §§ 404.1513(a), 404.1513(d)(1). As an other source, the ALJ may consider the opinion along with the other available evidence.20 C.F.R. § 404.1513(d)(1). Chiropractors' opinions are not entitled to any special weight or consideration.20C.F.R. §404.1513(d)(1). Factors to consider when evaluating other sources' opinions are: (1) length of time and frequency of treatment; (2) consistency with other evidence; (3) the degree to which the source presents relevant evidence to support the opinion; (4) how well the opinion is explained; and (5) whether the source has a special expertise. *King v. Astrue*, 2010 U.S. Dist. LEXIS 25901 at *20-21 (M.D. Fla. Mar. 19, 2010). Furthermore, it is appropriate to give more weight to an "other source" opinion than an "acceptable medical source" where the other source has seen the claimant more often and has provided better supporting evidence. *Id.*

When assessing medical opinions, the ALJ is "required to state with particularity the weight he gave the different medical opinions and the reasons therefor. *Sharfarz v. Bowen*, 825 F. 2d 278, 279 (11th Cir. 1987). The ALJ is not permitted to disregard the opinion of a chiropractor simply because it was not considered an acceptable source of medical evidence. *Williams v. Astrue*, 2008 U.S. Dist. LEXIS 35423 at *2 (M.D. Fla. Apr. 30, 2008). However, the ALJ may reject any medical opinion that is contrary to the evidence. *Sharfarz*, 825 F. 2d at 280.

After evaluation of all factors, the Court concludes that it is clear from the context of the ALJ's discussion of Dr. D'Agostino's opinion that he gave it little weight because it was not supported by objective medical evidence and other treatment from acceptable medical sources. Specifically, Dr. Banerian, an examining physician, noted degenerative changes and scoliosis were present in 2003 but concluded there were no significant abnormalities present. Additionally, in 2004, Dr. Correnti, a treating physician, diagnosed Claimant with cervical displacement which only required conservative

treatment. Dr. Kline, an examining physician, concluded that Claimant was able to sit, stand and/or walk for six hours in an eight hour work day if given normal breaks. Dr. Kline did not note any manipulative limitations.

Unlike the objective evidence previously mentioned, Dr. D'Agostino did not explain his reasons for determining the Claimant was as limited as he alleged. Rather, Dr. D'Agostino presented treatment records that reflected Claimant's subjective pain and the type of treatment performed during each session. The treatment notes do not reflect a condition as limited as suggested based upon medical evidence. As such, it was proper for the ALJ to reject Dr. D'Agostino's opinion because it was contrary to the other medical evidence presented by acceptable medical sources.

**IV.     Conclusion**

Accordingly, the ALJ's decision is consistent with the requirements of the law and supported by substantial evidence. Therefore, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. §405(g). The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this ___18th___ day of November, 2011.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record